CYNTHIA J. PHILLIPS *vs.* YOUTH DEVELOPMENT
PROGRAM, INC.

Hampden. June 10, 1981. — November 8, 1982.

Present: ARMSTRONG, GREANEY, & SMITH, JJ.

*Civil Rights. Practice, Civil,* Civil rights. *Constitutional Law,* State action. *Juvenile Court,* Probation. *Contract,* Employment. *Due Process of Law,* Employment. *Public Employment,* Termination.

A private corporation existing under G. L. c. 180, which received its operating funds from the Commonwealth and which provided, under a contract with the Commonwealth, various social services in aid of the "intensive juvenile probation program" of a Juvenile Court, was not associated with the court in so close and continuing a fashion that the action of its board of directors in dismissing a social worker employed by the corporation was attributable to the State, and thus wrongful in the absence of proceedings affording her due process of law. [635-639] ARMSTRONG, J., concurring. GREANEY, J., dissenting.

Where a plaintiff did not allege or offer evidence tending to show that she had been discharged from her employment in order to prevent her from obtaining compensation related to past services, her action against the employer presented no issue respecting an implied covenant of good faith and fair dealing. [639]

CIVIL ACTION commenced in the Superior Court Department on October 12, 1979.

The case was heard by *Keady,* J., a District Court judge sitting under statutory authority.

*Anne Rideout* for the defendant.

*Gerald R. Hegarty* for the plaintiff.

SMITH, J. The plaintiff brings this action against her employer, Youth Development Program, Inc. (YDP), alleging that she was wrongfully discharged in that she was not afforded procedural due process as required under the Fourteenth Amendment to the United States Constitution and

art. 12 of the Massachusetts Declaration of Rights.[1] The Fourteenth Amendment to the Constitution provides in part that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." The heart of the plaintiff's claim is that YDP, a private corporation, is associated with the Springfield Division of the Juvenile Court Department of the Trial Court (Juvenile Court) in such a close and continuing fashion that its action in discharging her is fairly attributable to the State, and therefore she is owed due process. *Evans* v. *Newton,* 382 U.S. 296, 299 (1966) ("[C]onduct that is formally private may be so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon [S]tate action"). See also *Lugar* v. *Edmondson Oil Co.,* 457 U.S. 922, 939-942 (1982); *Rendell-Baker* v. *Kohn,* 457 U.S. 830, 839-843 (1982). The plaintiff seeks reinstatement to the position from which she was discharged, compensation for the time she was unemployed, reimbursement for health insurance payments, damages for intentional infliction of emotional distress, and attorney's fees. In reply, the defendant argues that YDP is an independent contractor and that its action in

---

[1] Plaintiff asserts in her brief that the action is brought under 42 U.S.C. § 1983 (1970), which prohibits interference with Federal rights "under color of" State law. A person may bring an action under § 1983 in a State court, *Rzeznik* v. *Chief of Police of Southampton,* 374 Mass. 475, 484 (1978) ("Because neither § 1983 nor its jurisdictional counterpart, 28 U.S.C. 1343 [1970], vests exclusive jurisdiction over civil rights cases in the Federal courts, a grant of concurrent jurisdiction in the State courts is presumed"). However, the plaintiff failed to allege all of the necessary elements of a § 1983 claim in her complaint; nor did she specifically refer to the statute in her pleadings, as is the "preferable course." See *Rzeznik* v. *Chief of Police of Southampton,* 374 Mass. at 484 n.8. Nevertheless, to find the requisite "State action" at issue in this case, our analysis is identical under either the Fourteenth Amendment or § 1983. See *United States* v. *Price,* 383 U.S. 787, 794 n.7 (1966); *Lugar* v. *Edmondson Oil Co.,* 457 U.S. 922, 930-932 (1982).

General Laws c. 12, § 11I, inserted by St. 1979, c. 801, § 1, approved November 16, 1979, which provides a private right of action for a violation of constitutional rights, was not in effect at the time plaintiff was fired.

firing the plaintiff was merely private conduct which is not subject to due process requirements. *Shelley* v. *Kraemer,* 334 U.S. 1, 13 (1948) ("[T]he principle has become firmly embedded in our constitutional law that the action inhibited by the first section of the Fourteenth Amendment is only such action as may fairly be said to be that of the States. The Amendment erects no shield against merely private conduct, however discriminatory or wrongful"). See also *Civil Rights Cases,* 109 U.S. 3 (1883); *Jackson* v. *Metropolitan Edison Co.,* 419 U.S. 345 (1974); *Rendell-Baker* v. *Kohn,* 457 U.S. at 839-843.

The case was tried before a judge, sitting without a jury, who ruled that the defendant's action in firing the plaintiff constituted State action, and judgment was entered in favor of the plaintiff.[2] Later the judge filed supplemental findings to the effect that the plaintiff's communications were constitutionally protected and which also established the amount of attorney's fees. An amended judgment was entered and the defendant appeals from that judgment.[3] We have before us a transcript of the evidence that accompanied the judge's findings of fact. We accept his findings

---

[2] The judge found for the defendant on the count for intentional infliction of emotional distress. "Compensatory" damages were granted, however, for an alleged violation of the plaintiff's First Amendment rights.

[3] On February 12, 1981, after the briefs had been filed in this case, the United States Court of Appeals for the First Circuit decided the case of *Rendell-Baker* v. *Kohn,* 641 F.2d 14 (1st Cir. 1981). Both parties recognized that *Rendell-Baker* was a key case with respect to State action and accordingly devoted a considerable portion of their oral arguments to discussing its effect on the decision in this case. While this opinion was being prepared, the United States Supreme Court granted certiorari in *Rendell-Baker.* It was the belief of the members of the panel that this decision should be postponed until the Supreme Court decided *Rendell-Baker* because that decision would clearly have significant bearing on the critical issue of State action in this case. Counsel for both parties were notified that the decision in this case would be late. The Supreme Court affirmed the First Circuit Court of Appeals on June 25, 1982. *Rendell-Baker* v. *Kohn,* 457 U.S. at 830. After the decision was announced, we requested counsel to file memoranda of law addressing the impact of *Rendell-Baker* on the issues in the present appeal. Counsel responded and their memoranda have been of assistance to this court.

unless clearly erroneous. Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974). We note that the trial judge, at the time he made his findings, did not have the benefit of the trilogy of recent decisions of the United States Supreme Court that involve the problem of State action.[4] As a result, it is necessary for us, at times, to make our own findings on certain points. Our findings, however, do not depend on the credibility of witnesses; they are based on documentary evidence, i.e., the articles of organization and the by-laws of YDP, and the written contract between YDP and the Commonwealth. We now summarize the relevant facts, including the history of YDP and its relationship with the Juvenile Court, as well as the events which culminated in the discharge of the plaintiff.

1. *History and function of YDP.* In 1971, the plaintiff was hired by the Juvenile Court as a social worker and was assigned to its intensive juvenile probation program. This program, not statutorily mandated, was financed by the Governor's Committee on Criminal Justice,[5] and was concerned with broadening the alternatives available to juveniles on probation. In 1972, in order to increase its financial flexibility, the program was incorporated as YDP under G. L. c. 180. The purposes of the corporation as detailed in its articles of organization were: (1) "[t]o provide individual and group counseling, recreational and educational program[s] for those children referred to it by the Springfield Juvenile Court and by duly organized and established organizations seeking its service[s]"; and (2) "[t]o help facilitate communication between various institutions dealing with youth, such as the police, courts, schools and other

---

[4] On June 25, 1982, the Supreme Court decided three cases involving the question whether or not private actions were State actions for the purposes of the due process clause of the Fourteenth Amendment. The cases are *Rendell-Baker* v. *Kohn,* 457 U.S. 830; *Lugar* v. *Edmondson Oil Co.,* 457 U.S. 922; and *Blum* v. *Yaretsky,* 457 U.S. 991.

[5] This organization disbursed Federal funds received by the Commonwealth from the Law Enforcement Assistance Administration. See *Rendell-Baker* v. *Kohn,* 641 F.2d 14, 17 n.4 (1st Cir. 1981).

social agencies, and to broaden the awareness and understanding of the general community regarding the unique problems of youth, and to do all things incidental or convenient to carry out these purposes."

The various functions of the staff of YDP were substantially the same after incorporation as before. The sole institutional client was the Juvenile Court.[6] Juveniles were referred to YDP by Juvenile Court probation officers, who recommended the types of services they desired the juveniles to receive from the staff. Staff members would screen the referrals and determine whether a juvenile could benefit from YDP services. In addition to intensive individual and group counseling, the services consisted of an alternative classroom for junior high school juveniles, a volunteer program matching people in the community with probationers, and a recreational activities program.

2. *The corporate organization of YDP.* Of the seven original incorporators of YDP, five were employees of the Juvenile Court. They included the judge, the clerk, and assistant clerk, as well as the chief probation officer and the assistant chief probation officer. Under the by-laws, the sole duty of the incorporators was to elect persons to the board of directors. At the time of the discharge of the plaintiff, there were nine directors, of which three were employees of the Juvenile Court, including the chief probation officer, her assistant, and the assistant clerk. The business of the corporation was managed by the board of directors. The by-laws provided that the "Intensive Probation Program will be subject, in all phases, to the final approval of the presiding justice of the Springfield Juvenile Court[,] which will include policy, programming, and personnel."

3. *Financing of YDP.* In January, 1977, the Hampden County commissioners entered into a contract with YDP whereby the latter provided intensive juvenile probation

---

[6] The articles of organization stated that the corporation could provide its services not only to the Springfield Juvenile Court but also to other "duly organized and established organizations" seeking its services. Apparently, no other organization had applied for its services.

services to the Juvenile Court. The contract was terminated on June 30, 1979, because of the takeover of court costs by the Commonwealth. See G. L. c. 29A, § 1, inserted by St. 1978, c. 478, § 12. Until that date, YDP was funded solely by Hampden County, and during the covered period the employees of YDP received their paychecks and W-2 forms from the county.

In early 1979, the board of directors anticipated the takeover by the Commonwealth of court costs and started to negotiate a contract with the Commonwealth. They were successful, and financing for YDP's program was included as a line item in the Commonwealth's budget for the fiscal year beginning July 1, 1979, which was signed by the Governor on July 19 of that year. After July 1, 1979, YDP was exclusively funded by the Commonwealth for each fiscal year. All salaries were disbursed from and administered through the office of the State Treasurer. Tax withholding forms for the staff of YDP were received from the State, but bore the notation "non-employee."

4. *YDP's contract with the State.* Although State financing was secured in July, 1979, YDP's contract with the Commonwealth was not executed until October 11, 1979. The contract is of considerable significance because the judge relied on certain clauses of the contract in holding that there was State control.[7] The judge found that "[t]he contract is replete with instances of domination by and requirements of cooperation with the [c]ourt." In order to show "domination" of YDP by the State, the judge quoted clauses wherein YDP agreed to "cooperate administratively with all other programs and entities that provide services to the [j]udicial [b]ranch" and to "be available to meet with and work out schedules with the presiding justice [of the Juvenile Court]" and "cooperate with the [a]dministrative [o]ffice and [j]ustices of the Trial Court." In addition, the judge noted that the contract required quarterly statistical

---

[7] The discharge of the plaintiff took effect prior to the execution of the contract on October 11, 1979. The contract was retroactive to July 1, 1979, which date was prior to the plaintiff's discharge.

and financial reports to the administrative office and that YDP had to establish a satisfactory accounting system.

The only finding of the judge concerning personnel matters was that under the contract YDP had to follow "[c]ertain hiring practices." Because the judge did not have the benefit of *Rendell-Baker* v. *Kohn,* 457 U.S. 830 (1982), *Lugar* v. *Edmondson Oil Co.,* 457 U.S. 922 (1982), and *Blum* v. *Yaretsky,* 457 U.S. 991 (1982), he did not make any further findings regarding the degree of control over YDP personnel that was granted to the Commonwealth by the contract. We note that the contract states that YDP must "publicly advertise any position which becomes available as a result of this [contract]."[8] YDP was responsible for the "daily supervision of the program" and "for the competency of all personnel employed or assigned under" the contract "and [must] evaluate the background and experience of said personnel." YDP was required to "keep on file the names, addresses, and description of experience and background of members of its staff." Also YDP was required to "provide information of any change in personnel hired by or associated with [YDP]" in connection with the contract. Finally, in two places in the agreement, YDP agreed "to provide personnel and necessary supporting services in accordance with" the contract. We note that nothing in the contract gave to the Commonwealth the right to hire or fire personnel. The contract was executed on October 11, 1979, by the Chief Administrative Justice of the Trial Court and Samuel A. Marsella, president of YDP, for that organization. Mr. Marsella is an attorney engaged in private practice.

5. *The discharge of the plaintiff.* Following the incorporation of YDP in 1972, the plaintiff and all her immediate coworkers in the intensive juvenile probation program were transferred to the new corporation. At that time, the Juvenile Court judge gave the plaintiff and her coworkers

---

[8] This clause is undoubtedly the basis for the judge's finding that YDP had to follow "certain hiring practices."

the oath as deputy probation officers of the Juvenile Court.[9] During her tenure as an employee of YDP until October, 1979, the plaintiff was never reprimanded or disciplined for misconduct.

During the spring of 1979, the board of directors entered into contract negotiations with the Commonwealth. Because of the sensitivity of the negotiations, the staff, including the plaintiff, was admonished not to engage in independent lobbying activities. The board of directors and the program director informed the staff on several occasions that they alone would participate in lobbying and negotiations.

Although financing for YDP's program was included as a line item in the Commonwealth's budget for the fiscal year beginning July 1, 1979, the budget was not signed until July 19, 1979, and the contract was not executed until October 11, 1979. Consequently, no compensation checks from the Commonwealth were forthcoming by the end of July, 1979. To fill the void, the treasurer of YDP personally borrowed and advanced money to the staff for July salaries with the understanding that the money would be repaid upon receipt of the July salary checks. On August 20, 1979, the staff was informed that a contract still had not been signed and that the Commonwealth might not issue the checks until sometime in October.

The prospect of delayed payments caused the plaintiff to anticipate personal financial problems. She sought out one Burnett, president of a local bank, to discuss the possibility of a loan to cover her expenses while her salary payments

---

[9] In this instance, deputy probation officers do not have the same status as probation officers. Under G. L. c. 276, § 89A (inserted by St. 1967, c. 401), judges of the District and Superior Courts may appoint volunteer workers to serve as deputy probation officers to probationers under the age of 17 who have been placed in the care of probation officers. The statute states that the deputy probation officers are to serve as counsellors in order that the probationers "may receive to a greater degree individual attention and guidance." Unlike probation officers, deputy probation officers do not receive compensation, and there are no qualifications necessary for the position.

were interrupted. She explained to Burnett her financial problems and the cause of them. Burnett informed the plaintiff that he would have to investigate YDP's situation because he wanted to be assured that the plaintiff would be in a position to repay the loan if it was granted by the bank. He indicated that he knew State Senator Alan Sisitsky and that he would communicate with the Senator's office for the information. He also indicated his personal displeasure with a situation which forced someone like the plaintiff to borrow money while awaiting pay.

Burnett called Senator Sisitsky's office, but because he had few of the details which the Senator's aides needed in order to check on the funding question, he called the plaintiff and requested that she submit a memorandum to him outlining the situation in regard to the delay of YDP's contract. On August 24, 1979, the plaintiff responded with a memorandum that was factual, but which reflected her frustration and partisan concern. Burnett, in turn, sent the memorandum directly to the Senator, accompanied by a handwritten indignant note asking the Senator to look into the matter.

On September 18 or 19, 1979, as a result of a communication from the director of YDP, the plaintiff discovered for the first time that Burnett had written to Senator Sisitsky. On September 27, six of the nine directors met, and five voted to discharge the plaintiff. Two of those six directors were employees of the Juvenile Court, one of whom abstained from voting. On October 4, the plaintiff met with the director and Mr. Marsella and was informed by Mr. Marsella that she was being discharged because of insubordination.

The plaintiff returned that afternoon with her attorney, intending to meet with the board of directors. However, the five directors who met that afternoon did so as the personnel committee, not as the board of directors. At that meeting the plaintiff was informed that her involvement in "facilitating" Burnett's letter to Sisitsky was deemed to con-

stitute lobbying which was insubordinate behavior on her part and was in conflict with the board's stated policy.

Counsel for the plaintiff requested a hearing before the full board. Mr. Marsella indicated that he would not change his vote in favor of the plaintiff, but left the decision whether to attend a meeting of the full board to the plaintiff. The plaintiff opted not to pursue the matter further before the full board but brought this action instead.

Our inquiry is not directed in the first instance to whether the plaintiff was discharged because of speech or conduct protected by the Constitution, or without adequate due process, but rather to the question whether the challenged conduct of YDP, a private corporation, in discharging the plaintiff can fairly be seen as State action. If the conduct of YDP is not State action, our inquiry ends. *Rendell-Baker* v. *Kohn*, 457 U.S. at 838.

The trial judge found that the discharge of the plaintiff by YDP constituted State action because (1) YDP performed a public function; (2) YDP's entire budget was obtained from the Commonwealth; and (3) YDP was subject to extensive control by the Commonwealth as a result of its contract. As stated before, the judge did not have the benefit, as we do, of the trilogy of cases decided by the United States Supreme Court after judgment was entered in this case. Based on the analysis found in those cases, and particularly in *Rendell-Baker* v. *Kohn*, 457 U.S. 830 (1982), we find there was no State action in the discharge of the plaintiff.[10]

---

[10] In *Rendell-Baker* v. *Kohn*, *supra*, a privately operated school for maladjusted high school students fired some of its teachers for criticizing school policies and the director of the school. The United States Supreme Court held that State action was not involved in the discharge of the teachers. The facts showed that in recent years nearly all of the students had been referred to the school by city school committees under G. L. c. 71B, §§ 3 & 4, or by a State agency. At least ninety percent of the school budget was paid out of public funds. In order to be eligible for tuition funding under the statute, the school had to comply with a variety of State regulations. The Court stated that the fact that the school performed a public function in educating maladjusted students did not make its act State action. The school's receipt of public funds did not make the

The trial judge ruled that YDP performed a public function in that it provided services "directly related to and dependent upon the Springfield Juvenile Court and its administration of justice." The relevant question, however, is not whether a private group is serving a "public function" but "whether the function performed has been 'traditionally the *exclusive* prerogative of the State'" (emphasis in original). *Rendell-Baker* v. *Kohn,* 457 U.S. at 842 (quoting *Jackson* v. *Metropolitan Edison Co.,* 419 U.S. at 353). The services provided by YDP, i.e., individual and group counselling, and the furnishing of recreational and educational programs to juvenile probationers, have not traditionally been the exclusive province of the Commonwealth. Churches, private schools, civic groups, Boys Clubs and Girls Clubs, the YMCA and YWCA, and other private groups have been providing similar services to troubled youths for well over a century. The establishment and the maintenance of a juvenile probation system is undoubtedly a traditional function of government. There is, however, no statute or State regulation that requires a court to establish an intensive probation program or to provide the type of services that are rendered by YDP. See *Rendell-Baker* v. *Kohn,* 457 U.S. at 842; *Blum* v. *Yaretsky,* 457 U.S. at 1011. The fact that YDP's clients are referred by the Juvenile Court does not make the discharge decision State action. See *Rendell-Baker* v. *Kohn,* 457 U.S. at 832-833, 842 (maladjusted children referred to private schools under G. L. c. 71B by city or town school committees or State agency). The oath taken by the plaintiff and other employees of YDP as deputy probation officers does not make the discharge of the plaintiff State action. The plaintiff was not paid as a probation officer, nor did she, under

discharge decisions acts of the State, nor was the decision to discharge compelled, or even influenced, by any State regulation. The Court noted that the regulations imposed on the school contain very few personnel requirements. Finally, the Court held that there was no "symbiotic relationship" between the school and the State.

the relevant statute, perform duties similar to those of regular Juvenile Court probation officers.[11]

The trial judge found that the entire budget of YDP was obtained from the Commonwealth, and this finding was an element in his determination that the decision to discharge the plaintiff was State action. In regard to this point, the Supreme Judicial Court has held that "near-complete governmental funding does not turn a private charitable and educational institution into a public entity so long as the private institution remains free, in fact, to control its own affairs." *Bello* v. *South Shore Hospital,* 384 Mass. 770, 776 (1981), quoting with approval *Rendell-Baker* v. *Kohn,* 641 F.2d 14, 25 (1st Cir. 1981). See also *Rendell-Baker* v. *Kohn,* 457 U.S. at 841-842. The fact that the Juvenile Court was the sole source of referrals and that YDP received 100% financing from the Commonwealth does not by itself make the discharge of the plaintiff State action. *Ibid.* ("The school . . . is not fundamentally different from many private corporations whose business depends primarily on contracts to build roads, bridges, dams, ships, or submarines for the government. Acts of such private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts").

The trial judge found that YDP was subject to extensive control by the Commonwealth as a result of its contract, and this finding was another element in his decision that State action was present in the decision to discharge the plaintiff. The United States Supreme Court, however, in *Rendell-Baker* v. *Kohn,* 457 U.S. at 841-842, and *Blum* v. *Yaretsky, supra* at 1010-1011, noted that the school in *Rendell-Baker* and the nursing home in *Blum* were the sub-

---

[11] Under G. L. c. 119, § 57, a probation officer must investigate every case of a delinquent child and make a report. The probation officer must be in court at the trial of the case "and furnish the court with such information and assistance as shall be required." There was no evidence that any of the staff of YDP who had been sworn in as deputy probation officers ever performed such functions.

jects of extensive regulations by the State but found no State action. In this case, it was not found, nor indeed alleged, that the decision to discharge the plaintiff was itself based on the contract or some rule of conduct or policy promulgated by the Commonwealth. *Rendell-Baker* v. *Kohn,* 457 U.S. at 842-843. From reading the contract, it is readily apparent that the Commonwealth had little interest in YDP's personnel matters and left the decisions of hiring and firing personnel to YDP.[12]

The decision to discharge the plaintiff was made by the board of directors. There was no finding by the trial judge, nor any evidence, that the Juvenile Court judge participated in any way in the decision to discharge the plaintiff. The requirement in the by-laws that "the Intensive Probation Program will be subject, in all phases, to the final approval of the presiding justice of the Springfield Juvenile Court[,] which will include . . . personnel" refers to the hiring of personnel and not to discharge decisions.[13]

In sum, the plaintiff has failed to show that "there is a sufficiently close nexus between the State and the challenged action of the [private corporation] so that the action of the latter may be fairly treated as that of the State itself." *Jackson* v. *Metropolitan Edison Co.,* 419 U.S. at 351. *Bello* v. *South Shore Hosp.,* 384 Mass. at 776. The contract with the Commonwealth did not require YDP to discharge the plaintiff, and where YDP retained control over personnel matters the decision by the board of directors to discharge was not State action.

---

[12] In *Rendell-Baker* v. *Kohn,* 457 U.S. at 841-842, the United States Supreme Court noted that the State agency had the power to approve persons hired as vocational counselors, but the Court held that such a regulation was not sufficient to transform a decision to discharge an employee, if made by private management, into State action.

[13] Our holding that the by-laws do not require the judge to approve discharge decisions of the board as to personnel is buttressed by the fact that the plaintiff does not allege or argue that the action of the board of directors in discharging the plaintiff was defective because the decision did not receive the approval of the judge. Also see note 12, *supra,* as to the effect on discharge decisions of the State's power to approve the hiring of personnel.

The plaintiff asserts that the relationship between YDP and the Commonwealth is mutually beneficial or "symbiotic" and, therefore, the Commonwealth must be "recognized as a joint participant in the challenged activity." *Burton* v. *Wilmington Parking Authy.*, 365 U.S. 715, 725 (1961). Although YDP's funding and function show a relationship of close cooperation with the Commonwealth, the broad range of independent discretion which, under the contract, the board of directors appears to possess, especially in personnel matters, "belie[s] the notion of [S]tate domination." *Rendell-Baker* v. *Kohn*, 641 F.2d at 27.

In the memorandum of law filed by the plaintiff after the decision of the United States Supreme Court in *Rendell-Baker* v. *Kohn*, 457 U.S. 830 (1982), the plaintiff argued that if this court finds no State action, the case should be remanded to the trial judge because he made no findings as to count 3 of the plaintiff's complaint. That count alleged the plaintiff's discharge constituted a breach of the implied condition of good faith and fair dealing contained in the plaintiff's employment contract. We note, however, that the plaintiff did not allege in her complaint, nor did she introduce any evidence to the effect, that she was discharged in order to prevent her from obtaining compensation that was related to her past service. Thus, this case does not fall within the line of cases illustrated by *Fortune* v. *National Cash Register Co.*, 373 Mass. 96, 104-105 (1977), *Cort* v. *Bristol-Myers Co.*, 385 Mass. 300, 303 (1982), and *Maddaloni* v. *Western Mass. Bus Lines*, 386 Mass. 877, 881 (1982).

The judgment is reversed and a new judgment is to enter dismissing the action.

*So ordered.*

ARMSTRONG, J. (concurring). There has been a significant trend in recent years towards cutting back on the direct provision of social services by the Commonwealth in favor

of contracting out such services to private providers. The trend is an outgrowth of a widespread perception that direct governmental provision of services is apt to be cost-ineffective because of built-in rigidities in the State personnel system — tenure laws, civil service laws, due process requirements, and the like — which give private enterprise an advantage in flexibility of response to changing conditions. Whether that perception is valid or not, the Legislature has elected over the last decade to provide many social services on the contract-out model in the expectation that the services could in that manner be provided at lower cost, and to the extent that we find "State action" in the activities of the contracting providers we tend to defeat the realization of that goal by reintroducing the very inflexibilities in the hiring and firing of personnel that the Legislature sought to avoid. I doubt very much that the employees of the myriad private social-service providers think of themselves as being entitled to the various due process and tenure benefits of Commonwealth employees.

It is difficult to know precisely where the *Rendell-Baker* case, 457 U.S. 830 (1982), and its companion cases (see *infra*) have left this area of the law; none was unanimous, and there was a different spokesman for the majority in each. It is easy, however, to sense that the three cases mark a significant shift in the direction of shrinking the concept of State action and that it will no longer suffice merely to find a closeness or "nexus" between the State and the contracting corporation which will bring all the corporation's personnel decisions within the broad sweep of "State action." Rather, as Justice Smith indicates, the relevant inquiry seems now to be whether the particular action complained of — in this case the discharge of the plaintiff — is the product of a State "rule of conduct or policy," *Rendell-Baker* v. *Kohn*, 457 U.S. 830, 844 (1982) (White, J., concurring), or was made "in concert with [S]tate actors." *Id.* at 838 n.6 (majority opinion).

There is no suggestion in this case that the plaintiff's discharge resulted from some rule of conduct or policy pro-

mulgated by the State. The aspect of the case that most gives one pause is the fact that three of the nine members of YDP's board of directors and one of the five who voted for the discharge were employees in the Springfield Juvenile Court. That fact is, in my opinion, not analytically relevant to the determination whether the discharge decision was "State action," because there is no suggestion in the record that any of the three acted in his capacity as a State employee in connection with the plaintiff's discharge. Case illustrating the relevant analysis of cases involving State actors are discussed in note 6 (at 838) of the *Rendell-Baker* opinion. To carry the analysis beyond the scope of those cases would portend the possibility that the mere presence of State employees on a board of trustees of a charitable corporation having significant contracts with the State (such as the hospital in *Bello* v. *South Shore Hosp.,* 384 Mass. 770 [1981]) would bring the personnel actions of the board within the sphere of "State action." Such would be to extend the concept of State action considerably beyond the outermost frontiers of the decided Federal cases.

It is worth mentioning that the very closeness of the relationship between the Springfield Juvenile Court and the board of YDP may be suspect under State law. The problem arises from the court's role in engaging the services of a provider whose board of directors includes employees of the court, those employees standing in a position, arguably, to influence the court's decision whether to utilize the services of YDP in particular cases. There is no suggestion here of possible violations other than technical in nature (the members of the board apparently receive no compensation from YDP), but the application of the Conflict of Interest Law does not necessarily turn on the presence of absence of a personal financial interest, direct or indirect. See, e.g., G. L. c. 268A, § 6(*a*), inserted by St. 1962, c. 779, § 1 ("[A]ny [S]tate employee who participates as such employee in a particular matter in which to his knowledge . . . a business organization in which he is serving as . . . director . . . has a financial interest . . . shall be punished . . ."). Cf. G. L.

c. 268A, § 4(c).  State law favors (if it does not mandate) arm's-length dealings in the making of contracts between agencies of the Commonwealth and providers of services, suggesting that the safer course might be for employees of the Springfield Juvenile Court to sever their connection with the board of YDP.

Actions taken by a State officer may be "State action" notwithstanding that those actions violate State policy, see *Lugar* v. *Edmondson Oil Co.*, 457 U.S. 922, 933 (1982), but here it seems clear that the action of the court employee who voted as a member of the YDP board to discharge the plaintiff was not taken in his capacity as an employee of the Commonwealth and was not guided or encouraged by any rule, decision, or policy of the Commonwealth.  Accordingly, the discharge decision was not action by the Commonwealth, and for that reason I concur in the opinion of Justice Smith.


GREANEY, J. (dissenting).  There is ample support for the conclusion that Ms. Phillips has been discharged in violation of her rights under the First, Fifth, and Fourteenth Amendments to the United States Constitution and arts. 12 and 16 of the Massachusetts Declaration of Rights.[1]  The majority hold, however, that the judgment must be reversed because

---

[1] Ms. Phillips would not have been discharged had she not complied with the banker's request.  Compare *Mt. Healthy City Sch. Dist. Bd. of Educ.* v. *Doyle*, 429 U.S. 274, 285-287 (1977).  Although her written communication to the banker might have been critical of the defendant, her interest in free expression clearly outweighed the defendant's interest in maintaining the efficiency of its programs by avoiding employee comment on its budget.  See *Pickering* v. *Board of Educ.*, 391 U.S. 563, 568 (1968).  Her communications were no less protected because they were intended for the ears of the banker alone.  *Givhan* v. *Western Line Consol. Sch. Dist.*, 439 U.S. 410, 414 (1979).

The defendant also failed to provide due process in connection with the discharge.  The proceedings were peremptory in nature and lacked any meaningful opportunity for Ms. Phillips to show that she had not been insubordinate.  The procedure followed failed to comport with minimum due process standards.  See *Goldberg* v. *Kelly*, 397 U.S. 254, 267-268 (1970).

the defendant's decision to discharge Ms. Phillips cannot be attributed to the State. In my view, the defendant's performance of a public function and the substantial involvement of the State, through the Springfield Juvenile Court, in its affairs establish "a sufficiently close nexus between the State and the [defendant's] challenged action . . . so that the action of the latter may be fairly treated as that of the State itself." *Jackson* v. *Metropolitan Edison Co.*, 419 U.S. 345, 351 (1974). See *Evans* v. *Newton*, 382 U.S. 296, 299 (1966); *Moose Lodge No. 107* v. *Irvis*, 407 U.S. 163, 175 (1972); *Flagg Bros.* v. *Brooks*, 436 U.S. 149, 157 (1978).

The critical facts merit restatement. Ms. Phillips was hired as an employee of the Springfield Juvenile Court and assigned to the court's "intensive juvenile probation program" (program), directed by the court's assistant chief probation officer. The defendant's incorporation in 1972, under G. L. c. 180, was expressly approved by the Juvenile Court judge and several court officials. The court had significant representation on the defendant's board of directors thereafter. After incorporation, Ms. Phillips and others were transferred to the defendant's staff and sworn, under G. L. c. 276, § 89A, as deputy probation officers. The defendant's staff was permitted to use a letterhead bearing the Commonwealth's seal and the words "Springfield Juvenile Court — Intensive Probation Program." On its left side the letterhead listed the names of the Juvenile Court judge and other court officials; and on the right side the names of the defendant's supervisory staff. Staff members also carried business cards with the Commonwealth's seal, identifying the program as part of the "Trial Court of the Commonwealth — Juvenile Court Department, Springfield Division."

Prior to July 1, 1979, the effective date of the Court Reorganization Act, the defendant was exclusively funded by the county of Hampden under a written agreement with the county commissioners. This agreement named the defendant the exclusive provider for the intensive juvenile probation needs of the Springfield Juvenile Court. During this period,

Ms. Phillips was paid by checks issued by the county treasurer's office, and she received annual wage and tax statements (W-2's) which identified her as a county employee. After the implementation of court reorganization, the defendant was exclusively funded by the Commonwealth. Ms. Phillips was thereafter paid by checks of the Commonwealth, issued by the State Treasurer's office. Deductions were made for insurance but not under the Federal Insurance Contributions Act (FICA). The W-2 statements identify the Commonwealth as Ms. Phillips' "employer," but also bear the notation "non-employee."

In a document depicting the court's activities and functions, the defendant's probation program is listed as acting under the direct aegis of the Juvenile Court judge; its internal policy documents are replete with references to the court. At all relevant times, the defendant supplied services to the court pursuant to a written contract with the office of the Chief Administrative Justice.[2] That office required Ms. Phillips to complete an "Employee Position Evaluation Questionnaire" for the "Trial Court Department — Commonwealth of Massachusetts."

The vote to discharge Ms. Phillips occurred at a meeting of six directors, two of whom were court employees. One of these officials voted to discharge her. (The other abstained from voting.) Under the defendant's by-laws, five votes were necessary to discharge an employee. The purported ground for termination was insubordination. At all rele-

---

[2] The contract required, among other things, that the defendant (a) cooperate with the office of the Chief Administrative Justice of the Trial Court and Trial Court judges and work out schedules with the presiding justice of the Springfield Juvenile Court; (b) maintain and provide specified information to the office of the Chief Administrative Justice concerning personnel; (c) file quarterly statistical reports with that office; (d) cooperate administratively with all other programs and entities providing services to the judicial branch of the government; and (e) provide personnel and supportive services in keeping with the budget incorporated in the contract. The Chief Administrative Justice had the right to terminate the contract and to suspend payments upon any failure by the defendant to comply with its obligations.

vant times, the by-laws contained a further provision that the activities of the "Intensive Probation Program will be subject, in all phases, to the final approval of the presiding justice of the Springfield Juvenile Court[,] which will include policy, programming, and personnel."

The majority appear to construe *Rendell-Baker* v. *Kohn,* 457 U.S. 830 (1982), as requiring separate analysis of each indication of State action. That analysis fails to evaluate the *aggregate* of all the circumstances bearing on the question in light of established Federal precedents, none of which was changed by the *Rendell-Baker* decision.[3]

*Rendell-Baker* enumerates four general principles. First, the receipt by a private enterprise of a large amount of public funding *alone* will not constitute a legally tenable basis for finding State action. *Id.* at 840-841. Second, extensive general regulation of that enterprise by the State similarly will not be sufficient by itself to make the State responsible for actions taken by the enterprise, especially where the particular transaction is of a type not heavily burdened by regulation. *Id.* at 841-842. Third, the enterprise's performance of a public function, i.e., a function which has been "traditionally exclusively reserved to the State," *Jackson* v. *Metropolitan Edison Co.,* 419 U.S. at 352, continues to be a significant indication that the State has cloaked the enterprise with its authority. *Rendell-Baker,* at 842. Fourth, where a "symbiotic relationship" exists between the State and the enterprise, so that the two may be engaged in a mutually beneficial combination, the actions of the enterprise may reasonably be attributed to the State. *Id.* at

---

[3] It should be noted that the facts in *Rendell-Baker* differ significantly from the facts here. The school which employed Ms. Rendell-Baker was a private institution managed by a board of directors, none of whom were public officials or chosen by public officials. The only substantial connection with the State was the receipt of public funds. Its educational services were not those traditionally provided by the State. Most of the indicia of State action present in this case and discussed *infra* were absent. There are similar fundamental factual differences in *Lugar* v. *Edmondson Oil Co.,* 457 U.S. 922 (1982), and *Blum* v. *Yaretsky,* 457 U.S. 991 (1982), the cases decided with the *Rendell-Baker* case.

842-843.  See *Burton* v. *Wilmington Parking Authy.*, 365
U.S. 715, 723-724 (1961).[4]

Here the facts substantially support the conclusion that the
defendant's probation program was designed to be, and at
the time of the plaintiff's dismissal was, an integral part of
the Springfield Juvenile Court, an admitted agency of the
State.  There is no assertion that any action taken by court
officials contravened their authority.  The program was
established under the authority of the Juvenile Court judge,
exclusively served the court, and employed staff who were
hired by the judge and were paid directly from the State
Treasurer's office.  The staff used court materials which, on
their face, conveyed the clear impression that the defendant's
employees were acting as officers of the Juvenile Court.
Supervisory court employees held three seats on the defend-
ant's board of directors, while the Juvenile Court judge re-
tained express approval power over matters of "policy, pro-
gramming and personnel."  I can find no evidence that the
program's public characteristics were dissipated by incor-
poration.[5]  Instead, I find a close, working partnership be-
tween the Juvenile Court and the defendant in which the lat-
ter's freedom of decision making was circumscribed by State
officers of the Juvenile Court who possessed, and exercised,
the power to approve its staffing, policies, and operating
methodology.[6]

---

[4] *Rendell-Baker* neither overruled any existing United States Supreme
Court precedent, nor purported to limit the principles set out in cases such
as *Burton* v. *Wilmington Parking Authy.*, *supra*, and *Jackson* v. *Metro-
politan Edison Co.*, *supra*.  *Rendell-Baker* essentially sought to restrict
the trend which had developed in several of the Federal Circuit Courts of
Appeal to find State action by virtue of the private enterprise's receipt of
public funding or to fasten liability on the State by misapplying the public
function test.  Significantly, it left these latter tests intact as standards for
determining the presence of State action.

[5] The evidence establishes, as the majority note, that the "various func-
tions of the staff of [the defendant] were substantially the same after in-
corporation as before," and it is uncontroverted that incorporation was a
device to facilitate the receipt of contributions.

[6] The Juvenile Court judge exercised this power by approving Ms. Phil-
lips' hiring, participating in the defendant's incorporation, permitting

The defendant's probation activities also meet the public function test stated in *Jackson* v. *Metropolitan Edison Co.*, 419 U.S. at 352, and reemphasized as a critical indicator of State action in *Rendell-Baker* v. *Kohn*, 457 U.S. at 842. The facts stressed by the majority on this issue — that other civic and charitable organizations provide help to troubled youths and that "no statute or State regulation . . . requires a court to establish an intensive probation program" — are of little relevance. There is no question, as the majority concede, that the maintenance of a juvenile probation system is a traditional and required function of State government. And the long standing view of probation in this area has always been that youthful offenders should be treated "not as criminals, but as children in need of aid, encouragement and guidance." G. L. c. 119, § 53. See *Metcalf* v. *Commonwealth*, 338 Mass. 648, 651-652 (1959). The trial judge found that the defendant's "services when not identical to, complement the service[s] of the Juvenile Court Probation Department as . . . provided for in [G. L. c.] 119, [§§] 57 to 59, 62, 67 and 68." If the defendant did not exist, the supervision it provided to youthful offenders on probation would be assumed by the Juvenile Court's probation officers.[7] The defendant's program, viewed in light of the enumerated statutes, indicates that the defendant fulfilled obligations which are traditionally performed by the probation office of a Juvenile Court.

It is in this factual context that the circumstances of the defendant's funding take on significance. As the *Rendell-*

---

court employees to serve on its board, approving its policies, appointing members of its staff to the post of deputy probation officers, and permitting the use of court letterheads and business cards.

I give no special weight to the defendant's contract with the office of the Chief Administrative Justice. Although the contract gave some general supervisory power to that office, the primary State regulators were officers of the Juvenile Court.

[7] As the name of the defendant's program suggests, its services focus upon the sort of probation supervision that would be expected in a Juvenile Court. The defendant's staffing level, however, allowed a more direct and intense administration of those services.

*Baker* decision points out, the grant of funds by the State alone will not make an enterprise a State actor. Here, however, the State went considerably beyond the mere provision of funding. It provided for payment of the defendant's staff by the State Treasurer in a manner consistent with State employment (i.e. a deduction for insurance and no FICA deduction). In the absence of the characteristics usually found in a relationship with an independent contractor,[8] the defendant's complete financial dependence on the State and the latter's disbursement of its funds buttresses the conclusion that the government had become more than superficially involved in the defendant's affairs.

I also disagree with the majority's ruling that the decision to discharge was solely the decision of a private contractor. As previously noted, the defendant's personnel matters were subject to broad control by the Juvenile Court judge. The discharge was occasioned by publicity bearing on the defendant's providing probation services pending receipt of State funding, an issue of obvious and vital concern to both the Juvenile Court and the defendant.[9] The critical fifth vote necessary under the defendant's by-laws to discharge Ms. Phillips was supplied by a State officer. To the extent relevant, the "symbiotic relationship" between the two entities made the employment decision, for all practical purposes, one "based upon [a] rule of conduct . . . put forth by the State [i.e., the Juvenile Court]." Furthermore, I see no reasonable support in the record for the majority's con-

---

[8] If the defendant were an independent contractor, one would not expect to find substantial State representation on its board of directors, control over its policy and personnel by a State trial judge, and its considerable use of materials which hold it out as a State instrumentality. Moreover, an independent contractor would pay its personnel by its own checks and not by checks issued by the State Treasurer.

[9] These facts make the situation materially different from the case where a State officer serves on the board of a private institution and votes on a matter which is of concern to the State only in a broad and general sense. In this case, the court official voting for discharge was wearing his Juvenile Court hat at the time and enforcing a policy of benefit to the Juvenile Court.

clusion that the Juvenile Court judge's reserved power over personnel decisions applied exclusively to hiring. The fact that Ms. Phillips did not seek the judge's intervention to reverse her discharge would not warrant such an inference in view of the esoteric nature of the by-laws, the peremptory manner in which the discharge took place, and the virtual absence of notice of her rights of review.

I thus conclude that the defendant is quite unlike the private contractor who "depends primarily on contracts to build roads, bridges, dams, ships, or submarines for the government." *Rendell-Baker* v. *Kohn*, 457 U.S. at 841. I see no reason to fear that finding State action here will expose the State to unjustified liability or hamper its operations. I suspect the present situation is quite peculiar and that the usual social-services contracts between the State and other private agencies are of the sort scrutinized in *Rendell-Baker* and described in the concurrence of Justice Armstrong. In these contracts some funding and general regulation by the State typically will be involved, but the existence of a true, easily ascertainable independent contractor relationship will relieve the State from any liability for the agency's actions. In the absence of a finding that anything done here was unauthorized, the bonds tying the defendant and the Juvenile Court together for a mutually beneficial purpose warrant a conclusion that the requisite State action existed. I would affirm the judgment.